UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SWANSON GROUP MFG. LLC**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Case No. 10-1843 (RJL)** |
| | ) | |
| **KEN SALAZAR**, *et al.*, | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION
June **26**, 2013 [## 41, 44, 45]

Before the Court are three cross-motions for summary judgment by plaintiffs,

defendants, and defendant-intervenors. Pls.' Mot. for Summ. J., Apr. 3, 2012 [Dkt. # 41]

("Pls.' Mot."); Fed. Defs.' Cross Mot. for Summ. J., Mem. in Supp. Thereof, and Opp'n

to Pls.' Mot. for Summ. J., May 25, 2012 [Dkt. # 45] ("Defs.' Mot."); Def.-Intervenors'

Cross-Mot. for Summ. J., May 25, 2012 [Dkt. # 44] ("Intervenors' Mot."). In these

motions, the parties dispute the lawfulness of two federal agency actions: first, the failure

to offer for sale a declared amount of timber from two western Oregon districts, and

second, the development and use of an Owl Estimation Methodology. The Court holds

that both agency actions were unlawful and, therefore, enters judgment in favor of

plaintiffs on two of the five counts of the amended complaint. The remaining three

counts are dismissed as conceded or moot. In so doing, the Court GRANTS IN PART

1

AND DENIES IN PART plaintiff's motion, GRANTS IN PART AND DENIES IN

PART defendant's cross-motion, and DENIES defendant-intervenors' cross-motion.[1]

## BACKGROUND

Plaintiffs are timber manufacturing companies and trade associations based in the

Pacific Northwest. Am. Compl., Feb. 18, 2011 [Dkt. # 16], ¶¶ 3-7. Plaintiffs and

plaintiffs' membership rely upon the timber sales from federally-administered land in the

Medford and Roseburg districts of western Oregon. Decl. of Steven D. Swanson, Jan. 30,

2012 [Dkt. # 41-3] ("Swanson Decl."), ¶ 2; Decl. of Link Phillippi, Jan. 27, 2012 [Dkt. #

41-4] ("Phillippi Decl."), ¶ 2; Decl. of Thomas Partin, Mar. 29, 2012 [Dkt. 41-6] ("Partin

Decl."), ¶ 3; Decl. of Bob Ragon, Jan. 24, 2012 [Dkt. # 41-7] ("Ragon Decl."), ¶¶ 2, 6.

Plaintiffs' claims address two actions by agencies under the management of

defendants, Secretary of Interior Ken Salazar and Secretary of Agriculture Tom Vilsack.

First, plaintiffs' Claim One alleges that the Bureau of Land Management ("BLM"), an

agency within the Department of Interior, failed to offer for sale the statutorily-mandated

amount of timber from the Medford and Roseburg districts. Am. Compl. ¶¶ 57-64.

Second, plaintiffs' Claims Two and Three challenge the Owl Estimation Methodology

("OEM"), a set of procedures for assessing the impact of federal actions on the northern

spotted owl. *Id.* ¶¶ 65-79. The OEM was designed for use by BLM, the Fish and

Wildlife Service ("FWS") of the Department of Interior, and the United States Forest

---

[1] Defendant-intervenors address only the first count of the amended complaint in their
motion, Intervenors' Mot. at 1, while defendants address all five counts of the amended
complaint in their motion, Defs.' Mot. at 1-2.

Service ("USFS") of the Department of Agriculture. *Id.* ¶¶ 66.  These two agency actions are discussed further below.[2]

### A.    Count One: Failure to Offer for Sale Annual Sustained Yield Capacity

Under Claim One, plaintiff alleges that BLM violated two federal statutes.  The first statute is the Oregon and California Lands Act of 1937 ("O&C Act"), 43 U.S.C. § 1181a.  The O&C Act was enacted in 1937 to regulate timber production on federal lands in western Oregon, including the Medford and Roseburg districts.[3]  Under the statute, this federal land "shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principal [sic] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilties [sic]." *Id.*  The most relevant portion appears later in this section: "The annual productive capacity for such lands shall be determined and declared . . . [and] timber from said lands in an amount not less than one-half billion feet board measure, or not less than the annual sustained yield capacity when the same has been determined and declared, shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market." *Id.*

---

[2] Because plaintiffs have decided not to pursue Claims Four and Five of the Amended Complaint, those claims are dismissed as conceded. *See* Defs.' Mot. at 1-2; Pls.' Statement of P. & A. in Supp. of Mot. for Summ. J., Apr. 3, 2012 [Dkt. # 41-1] ("Pls.' Mem.") at 2 n.2.  These dismissed claims include all alleged violations of the Endangered Species Act. *See* Defs.' Mot. at 15 n.9.

[3] The Medford District contains 749,500 acres of land covered by the O&C Act, and the Roseburg District contains 405,502 acres of O&C land. Pls.' Mem. at 5-6.

The second statute at issue is the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1782.  In pertinent part, the statute directs that "[t]he Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when they are available . . . ." 43 U.S.C. § 1732(a).  The BLM's FLPMA regulations state that "[a]ll future resource management authorizations and actions, as well as budget or other action proposals to higher levels in the Bureau of Land Management and Department, and subsequent more detailed or specific planning, shall conform to the approved plan." 43 C.F.R. § 1610.5–3(a).

Pursuant to the FMPLA, the Secretaries of Interior and Agriculture developed a land use plan for Pacific northwest lands known as the Northwest Forest Plan ("NWFP") in 1994.  B/FAR 8878.[4]  Under the NWFP, much of the western Oregon lands were designated as a reserve for the northern spotted owl and other species.  *See* Pls.' Mem. at 9 (citing FWSAR 4298).  In 1995, BLM adopted new resource management plans ("RMPs") for the six western Oregon districts, dramatically reducing the districts' annual sustained yield timber capacity.  *See* B/FAR 6816 (Roseburg RMP), 12304 (Medford RMP).  Specifically, the 1995 RMPs declared an "allowable sale quantity" ("ASQ") of 57.1 mmbf for lands in the Medford district and 45 mmbf for lands in the Roseburg

---

[4] Defendants have submitted the administrative record in this case in two parts, each beginning with page 000001. *See* Admin. R., Dec. 20, 2011 [Dkt. # 34].  For convenience, the Court adopts the plaintiffs' citation form: the record part submitted by BLM and USFS is cited as "B/FAR," and the record part submitted by FWS is cited as "FWSAR." *See* Pls.' Mem. at 5 n.5.

district.  B/FAR 6885 (Roseburg), 12375 (Medford).  Both 1995 RMPs state that "[t]he actual sustainable timber sale level attributable to the land use allocations and management direction of the resource management plan may deviate by as much as 20 percent from the identified allowable sale quantity."  B/FAR 6886, 12375.  In other words, the annual sustained yield capacity is at least 80 percent of each district's ASQ.  The 1995 RMPs have remained in effect since their inception, despite many legal hiccups along the way.[5]

Since 2004, the Medford district has not offered for sale 80 percent of its ASQ in any year except 2005.  *See* B/FAR 88-92; Answer to Am. Compl., Sept. 8, 2011 [Dkt. # 25], ¶ 21.  Similarly, the Roseburg district did not offer for sale 80 percent of its ASQ in 2004, 2005, 2007, and 2009.  *See id.*  Plaintiffs allege that this failure to offer the annual sustained yield capacity of timber (i.e., 80 percent of the ASQ) constitutes "agency action unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1) and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory . . . authority" under 5 U.S.C. § 706(2).  *See* Am. Compl. ¶ 64.

---

[5] After a legal challenge to the NWFP, the BLM began a new planning effort known as the Western Oregon Plan Revision ("WOPR") to revise the 1995 RMPs.  *See* Pls.' Mem. at 9-10.  The WOPR was approved on December 30, 2008, *see* 74 Fed. Reg. 829 (Jan. 8, 2009), but was purportedly withdrawn on July 16, 2009 by the Department of Interior.  *See Douglas Timber Operators v. Salazar*, 774 F. Supp. 2d 245, 247 (D.D.C. 2011).  On March 31, 2011, Judge Bates of this Court vacated and remanded the purported withdrawal, which reinstated the WOPR.  *Id.* at 261-62.  However, the WOPR itself was vacated shortly thereafter in *Pacific Rivers Council v. Shepard*, No. 3:11-cv-442-HU (D. Or. May 16, 2012), thereby reinstating the 1995 RMPs.  An appeal of that decision was dismissed.  *Pacific Rivers Council v. Shepard*, No. 12-35570 (9th Cir. Mar. 1, 2013).  As such, the WOPR was never in effect for the purposes of this Court's legal analysis.

**B.    Counts Two and Three: Owl Estimation Methodology**

Claims Two and Three challenge federal agencies' use of the Owl Estimation

Methodology to comply with its consultation responsibilities under the Endangered

Species Act of 1973 ("ESA"), 16 U.S.C. §§ 1531 *et seq.*  Am. Compl. ¶¶ 65-79.  Under

the ESA, an agency must engage in formal consultation with FWS if a proposed agency

action may adversely affect a protected species or its critical habitat.  16 U.S.C. §

1536(a); 50 C.F.R. § 402.14(a). [6]  At the end of a formal consultation, FWS issues a

biological opinion.  16 U.S.C. § 1536(b)(3)(a); *see also Bennett v. Spear*, 520 U.S. 154,

154 (1997).  If the agency action is allowed to proceed, the biological opinion will

include an incidental take statement, which authorizes the agency to "take" the species as

long as it respects certain limitations.  16 U.S.C. § 1536(b)(4); *see also Bennett*, 520 U.S.

at 169-70. [7]

FWS listed the northern spotted owl as a threatened species in 1990.  55 Fed. Reg.

26114 (June 26, 1990).  Since that listing, the northern spotted owl has triggered

prolonged, repeated, and contentious litigation between environmental groups, timber

groups, and the federal government in multiple jurisdictions.  *See, e.g.*, Pls.' Mem. at 11-

_____

[6] An agency can avoid formal consultation—in favor of "informal consultation"—if both
the agency and FWS agree that the proposed action is not likely to adversely affect listed
species or critical habitat.  50 C.F.R. §§ 402.13(a), 402.14(b)(1).  In this case, the agency
need not undergo further consultation or prepare an incidental take statement.  50 C.F.R.
§ 402.13(a).  The end product of informal consultation is typically a letter of "written
concurrence" from the FWS that the action is unlikely to have an adverse effect.  *Id.*
[7] To "take" a species is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap,
capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

14 (citing multiple cases).  For this Court's purpose, the most relevant litigation ended in
February 2007 with *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031 (9th Cir.
2007) ("*ONRC*").  In *ONRC*, the Ninth Circuit rejected an incidental take statement for
several Pacific northwest timber sales impacting the northern spotted owl.  *Id.* at 1032-33.

Shortly after the Ninth Circuit's decision, FWS, BLM, and USFS created an
interagency team to develop a new protocol that the agencies would use to authorize
incidental take of northern spotted owls in future timber sale consultations.  B/FAR
34624-25; FWSAR 2002.  On September 14, 2007, the agencies issued the "Methodology
for Estimating the Number of Northern Spotted Owls Affected by Proposed Federal
Actions," also known as the OEM.  FWSAR 2001.  While the OEM could be used in any
area with a northern spotted owl population, it was designed with Oregon as its initial
focus.  *Id.* at 2017, 2419.  The agencies did not give the public notice of the OEM's
issuance or an opportunity to comment on the OEM.  They also did not consult the
Department of Interior's Solicitor's Office about whether the OEM required notice and
comment under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553.  Decl. of
Theresa Rabot, Mar. 14, 2013 [Dkt. # 56-1], ¶ 2.  The agencies revised the OEM on
December 20, 2007 and on September 15, 2008, again without notice or comment.
FWSAR 2100, 2398.  The September 2008 version remains in effect today.

The OEM instructs agencies on a new method for estimating owl take when survey
data and other tools are not available.  *Id.* at 2399, 2405.  This method involves the
development of a Northern Spotted Owl Occupancy Map ("NSOOM"), which estimates

the presence of owls by combining known owl locations with "projected locations." *Id.* at 2400. To develop projected locations, the agencies rely upon "the amount and distribution of suitable owl habitat and best available information on known owl locations and spacing patterns for that area." *Id.* at 2399. Using this data and a random point generator, computers generate sites where owls likely would nest. *Id.* at 2422.

The agencies acknowledge that these owl sites "are based on a simulation that may not reflect actual spotted owl locations on the landscape." *Id.* at 2405. Despite its data-driven process, the computer may generate sites that do not coincide with suitable owl habitat; in this case, a site can be relocated manually to suitable habitat. *Id.* at 2407. Once the sites are generated, the OEM instructs the agencies to draw three concentric circles around the sites: a "nest patch," a "core area," and a "home range." *Id.* at 2409-13. The agencies then examine the percentage of each of these areas that a proposed action will affect in order to determine whether "take" is likely to occur. *Id.* at 2413-14. Using the OEM, the Medford District was assigned 172 computer-generated owl sites, B/FAR 26011, and the Roseburg district was assigned 69 such sites, FWSAR 13200.

## STANDARD OF REVIEW

Summary judgment is appropriate when the movant demonstrates that no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of proof, and the Court will draw "all justifiable inferences" in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986) (citation omitted). Nevertheless, the

non-moving party "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. "Thus, if the evidence presented by the opposing party is 'merely colorable' or 'not significantly probative,' summary judgment may be granted." *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002) (quoting *Anderson*, 477 U.S. at 249-50); *see also Montgomery v. Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008) ("The possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment.") (citations omitted). Factual assertions in the moving party's affidavits may be accepted as true unless the opposing party submits its own affidavits, declarations, or documentary evidence to the contrary. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992). Supporting or opposing affidavits must be made on the basis of personal knowledge and must set out facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

The key facts of this case are undisputed. Regarding Count One, defendants have failed to offer for sale the annual sustained yield capacity of the Medford and Roseburg districts in several years since 2004. Regarding the OEM, federal agencies developed and used the OEM without submitting the OEM to the notice and comment procedures of the APA. With these facts not in dispute, the only questions that remain are questions of law. As such, summary judgment is appropriate.

Upon a review of the statutory language, legislative history, and related case law, the Court concludes that the BLM violated its mandated duty to offer for sale the annual

sustained yield capacity of the Medford and Roseburg districts.  Further, the Court holds

that defendants improperly failed to submit the OEM to the rulemaking procedures of the

APA.  The Court, therefore, will grant summary judgment in favor of plaintiffs on Counts

One and Two of the Amended Complaint.[8]

## I.      Count One: Failure to Offer for Sale Annual Sustained Yield Capacity

Plaintiffs allege that defendants violated the O&C Act by failing to offer the

annual sustained yield capacity of timber (i.e., 80 percent of the ASQ) of the Medford and

Roseburg districts.  *See* Am. Compl. ¶ 64.  Defendants respond that they have not violated

the O&C Act because the Act does not impose a mandatory timber sale amount, Defs.'

Mot. at 19-24, and BLM has exercised its discretion properly in enforcing the Act, *id.* at

29-34.  Unfortunately, for defendants, they have not demonstrated that their timber sales

have complied with the O&C Act.  How so?

---

[8] On August 25, 2011, the Court rejected defendants' Motion to Dismiss the Amended
Complaint.  Min. Order, Aug. 25, 2011.  In that Motion to Dismiss, defendants argued
that plaintiffs lacked standing on Claims 1, 2, and 3 because they had not suffered a
concrete, particularized injury.  Fed. Defs.' Mot. to Dismiss the Am. Compl. and Mem. in
Supp. Thereof, Mar. 25, 2011 [Dkt. # 20] ("Mot. to Dismiss"), at 22-26.  Defendants
repeat this argument in their Motion for Summary Judgment, Defs.' Mot. at 27-29, and it
is again rejected.  Defendants also repeat several arguments that they frame as "standing"
arguments but are more akin to merits arguments.  *See* Mot. to Dismiss at 15-27 (arguing
that the O&C Act does not impose a mandatory timber sale requirement and that the
agency actions were not final, discrete actions subject to judicial review); *see also, e.g.,*
*Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183-84 (D.C. Cir. 2006) (determination of
whether agency action is "final" action subject to judicial review under the APA is not
jurisdictional).  These arguments will be addressed later in this Opinion.

## A.    The Timber Sale Mandate

Because this issue requires the Court to interpret language in a statute, the Court

must follow the well-established canons of statutory interpretation.  "[W]hen the statute's

language is plain, the sole function of the courts—at least where the disposition required

by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540

U.S. 526, 534 (2004) (citations and internal quotation marks omitted).  Under the O&C

Act, "[t]he annual productive capacity for such lands *shall* be determined and declared . .

. [and] timber from said lands in an amount not less than one-half billion feet board

measure, or not less than the annual sustained yield capacity when the same has been

determined and declared, *shall* be sold annually, or so much thereof as can be sold at

reasonable prices on a normal market." 43 U.S.C. § 1181a (emphasis added).  The use of

"shall" creates a mandatory obligation on the actor—in this case, BLM—to perform the

specified action. *See Allied Pilots Ass'n v. Pension Benefit Guar. Corp.*, 334 F.3d 93, 98

(D.C. Cir. 2003) (noting "the well-recognized principle that the word 'shall' is ordinarily

the language of command") (citation and internal quotation marks omitted); *United States

v. Ins. Co. of N. Am.*, 83 F.3d 1507, 1510 n.5 (D.C. Cir. 1996) ("Cases are legion

affirming the mandatory character of 'shall.'") (citing *United States v. Monsanto,* 491

U.S. 600, 607 (1989); *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 61

(1982) (per curiam); *Anderson v. Yungkau,* 329 U.S. 482, 485 (1947); *Ass'n of Civilian

Technicians v. FLRA,* 22 F.3d 1150, 1153 (D.C. Cir. 1994)).  Thus, the language of this

statute conveys a clear requirement: once BLM declares an annual sustained yield

capacity, it *must* sell that amount or so much thereof as can be sold at reasonable prices on a normal market.

Defendants respond by pointing to cases in which "shall" language was not considered mandatory in light of surrounding statutory language indicating that the acting party need not always act. *See* Defs.' Mot. at 22. The cases defendants cite, however, are clearly distinguishable. In *Sierra Club v. Jackson*, our Circuit held that a statute stating that the "Administrator shall . . . [act] as necessary" allowed discretion as to whether to act. 648 F.3d 848, 851, 856 (D.C. Cir. 2011). No such "as necessary" language exists in the O&C Act. Plaintiffs' other cases address a unique exception with respect to statutory deadlines, which is not relevant here. *See* Defs.' Mot. at 22 (citing *Brotherhood of Ry. Carmen v. Pena*, 64 F.3d 702, 704 (D.C. Cir. 1995); *Teamsters Local Union 1714 v. Pub. Employees Relations Bd.*, 579 A.2d 706, 710 (D.C. 1990); *Thomas v. Barry*, 729 F.2d 1469, 1470 n.5 (D.C. Cir. 1984)). In short, none of defendants' small sample of cases can justify an exception to the predominant rule: "shall" means "shall."

## B.    Extent of BLM's Discretion Regarding Timber Sales

Defendants next argue that, even assuming "shall" means "shall," the O&C Act permits BLM to exercise discretion as to the volume of timber sales. They point to *Portland Audubon Society v. Babbitt*, in which the Ninth Circuit found that "the plain language of the [O&C] Act supports the district court's conclusion that the Act has not deprived the BLM of all discretion with regard to either the volume requirements of the Act or the management of the lands entrusted to its care." 998 F.2d 705, 709 (9th Cir.

12

1993) (cited in Defs.' Mot. at 20).  They characterize plaintiffs' position as arguing that "the O&C Act imposed a mandatory duty upon BLM to sell the ASQ identified in its RMPs each year without fail . . . ."  Defs.' Mot. at 19.  I disagree.

Defendants mischaracterize both plaintiffs' position and the law.  Plaintiffs recognize that O&C Act permits flexibility as to the timber sale volume; they acknowledge that BLM need not sell the ASQ each year but rather must "at least offer for sale" the annual sustained yield capacity.  Pls.' Mem. at 27.  Indeed, BLM has discretion as to establishing the ASQ, selecting the timberlands, pricing the sale (at "reasonable prices on a normal market"), scheduling the sale, and even rejecting bids.  *See* 43 U.S.C. § 1181a ("[T]he Secretary is authorized, in his discretion, to reject any bids which may interfere with the sustained-yield management plan of any unit.").  The O&C Act does not prevent BLM from considering a variety of factors in its management of timber sales.  *See Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1314 (W.D. Wash. 1994) ("Management under [the O&C Act] must look not only to annual timber production but also to protecting watersheds, contributing to economic stability, and providing recreational facilities.") (citation omitted); Intervenors' Mot. at 1 (the O&C Act "contains more than a 'timber first' mandate: it embodies a multiple-use, sustained yield, protective standard for management of these federal public forest lands.").  But the key point remains the same: despite its discretion with respect to many aspects of the timber sales, BLM is nevertheless required *to sell or offer for sale at reasonable prices* the annual sustained yield capacity, and it has failed to do so.

13

### C.    Discrete and Final Agency Action

Defendants next suggest that this Court does not have authority to grant relief for

the BLM's failure to act under 5 U.S.C. § 706(1) because the claim does not target a

"discrete" agency action. Defs.' Mot. at 17-19. Please!  Under the APA, an "agency

action" is an "agency rule, order, license, sanction, relief, or the equivalent or denial

thereof, or *failure to act*." 5 U.S.C. § 551(13) (emphasis added).  In arguing that this

failure to act was not "discrete," defendants rely heavily upon *Norton v. Southern Utah*

*Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*").  *See* Defs.' Mot. at 17-18. In *SUWA*,

the Supreme Court held that the relevant statutory mandate—to "continue to manage

[wilderness land] in a manner so as not to impair the suitability of such areas for

preservation as wilderness"—lacked the "clarity" necessary to compel BLM to exclude

off-road vehicles under 5 U.S.C. § 706(1).  *Id.* at 65-66.  This vague and subjective

"manage[ment]" mandate is certainly *not* analogous to the O&C Act's clear, time-bound

timber sale mandate.[9]  Indeed, *SUWA supports* the enforcement of the O&C Act's

mandate: "when an agency is compelled by law to act within a certain time period, but the

manner of its action is left to the agency's discretion, a court can compel the agency to

---

[9] Nor is this vague "manage[ment]" mandate analogous to the other mandates that the
*SUWA* court hypothesized would be unreviewable: "to manage wild free-roaming horses
and burros in a manner that is designed to achieve and maintain a thriving natural
ecological balance, or to manage the New Orleans Jazz Historical Park in such a manner
as will preserve and perpetuate knowledge and understanding of the history of jazz, or to
manage the Steens Mountain Cooperative Management and Protection Area for the
benefit of present and future generations." *Id.* at 67 (citations and internal quotation
marks omitted).

act, but has no power to specify what the action must be." *Id.* at 65.   Because the O&C Act clearly compels BLM to offer for sale the annual sustained yield capacity, this mandate is sufficiently discrete to warrant judicial review and enforcement.

In addition to challenging whether relief is available under § 706(1), defendants argue that relief is unavailable under § 706(2) because plaintiffs have not challenged a "final" agency action. Defs.' Mot. at 24-25; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990) (courts may "intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect.") (citation omitted).   The parties seem to dispute whether the BLM's timber sales targets, laid out in "Annual Work Plans," are "final" actions. Pls.' Mem. at 28; Defs.' Mot. at 24-25; Pls.' Reply Brief in Supp. of their Mot. for Summ. J. and Opp'n to Defs.' and Def.-Intervenors' Cross-Mots. for Summ. J., June 25, 2012 [Dkt. # 49] ("Pls.' Reply") at 17-18; Fed. Defs.' Reply Mem. in Supp. of their Cross-Mot. for Summ. J., July 17, 2012 [Dkt. # 52] ("Defs.' Reply") at 6-7.   However, it is not the timber sales targets or Annual Work Plans that are the "action" at issue; rather, the relevant "action" is the failure to sell or offer to sale the annual sustained yield capacity. *See* Am. Compl. ¶ 64.   The failure to sell or offer to sell the requisite timber each year constitutes a "definitive" position that "has a direct and immediate . . . effect on the day-to-day-business of the parties." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 594 (D.C. Cir. 2001) (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) (internal quotation marks omitted)); *see also Bennett*, 520 U.S. at 178 (an agency action is

15

final if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow.") (citations and internal quotation marks omitted). Thus, the agency's failure to meet its timber mandate directly and immediately affects plaintiffs, who rely upon these timber sales for their survival. *See, e.g.*, Swanson Decl. ¶ 3; Phillippi Decl. ¶ 2. By failing to sell or offer for sale the annual sustained yield capacities in several recent years, BLM has committed a series of "final" agency actions warranting relief under § 706(2).

### D.    Remedy

Because defendant Salazar has failed to ensure BLM's compliance with the provisions of the O&C Act, the Court may declare the agency's failure to act as unlawful and compel the agency to act. *See* 5 U.S.C. § 706. Under this authority, the Court holds unlawful under the O&C Act defendant Salazar's failure to sell or to offer for sale the annual sustained yield capacity of the Medford and Roseburg districts in several years since 2004. As such, the Court orders defendant Salazar and/or his successors to sell or offer for sale the declared annual sustained yield capacity of timber for the Medford and Roseburg districts for each future year, in accordance with the O&C Act.[10]

## II.    Counts Two and Three: Owl Estimation Methodology

Next, plaintiffs ask the Court to vacate the OEM on two grounds: that the OEM was not submitted for notice and comment, and that its adoption was arbitrary, capricious,

---

[10] In order to award plaintiffs the relief requested under Count One, the Court need not— and therefore does not—find a violation of the FLPMA.

an abuse of discretion, and not in accordance with law.  Am. Compl. ¶¶ 65-79.  The Court

agrees with plaintiffs that the OEM was a final, legislative-type rule that should have

been subjected to notice and comment.  As such, summary judgment is granted in favor of

plaintiffs on Count Two.  Because the Court need not inquire as to whether the OEM was

arbitrary or capricious, Count Three is dismissed as moot.

### A.    Notice and Comment Requirement

The APA requires that agencies provide notice and an opportunity to comment

prior to issuing a "rule."  5 U.S.C. § 553.  A "rule" is defined as "the whole or a part of an

agency statement of general or particular applicability and future effect designed to

implement, interpret, or prescribe law or policy or describing the organization, procedure,

or practice requirements of an agency . . . ."  *Id.* § 551(4).  However, the APA expressly

exempts from the notice and comment requirement "interpretative rules, general

statements of policy, or rules of agency organization, procedure, or practice."  *Id.* §

553(b)(A).

Many cases before this one have attempted to distinguish a binding "legislative

rule" requiring notice and comment from an interpretive rule, statement of policy, rule of

procedure or practice, or other action that need not undergo notice and comment.  *See*

*Chrysler Corp. v. Brown*, 441 U.S. 281, 301-02 (1979) (only "substantive" or

"legislative-type rules" have the force and effect of law).[11]  To determine whether an

---

[11] The government does not attempt to characterize the OEM as one or more of the
specific exemptions to the notice and comment requirement.  It simply calls it a
"scientific methodology" or "scientific tool" that does not possess the "force of law."
Defs.' Mot. at 35.

agency action constitutes a binding legislative rule, our Circuit has been "guided by two

lines of inquiry." *See Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006);

*Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam). One line

of inquiry has examined the effects of the agency's action; it explores whether the agency

has "(1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its

decisionmakers free to exercise discretion." *CropLife Am. v. EPA*, 329 F.3d 876, 883

(D.C. Cir. 2003) (citation and internal quotation marks omitted). The language used by

an agency is an important consideration in such determinations. *See Cmty. Nutrition Inst.*,

818 F.2d at 946. The second line of inquiry focuses on the agency's expressed

intentions and considers three factors: "(1) the [a]gency's own characterization of the

action; (2) whether the action was published in the Federal Register or the Code of

Federal Regulations; and (3) whether the action has binding effects on private parties or

on the agency." *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999) (citing *Fla.

Power & Light Co. v. EPA*, 145 F.3d 1414, 1418 (D.C. Cir. 1998)); *see also CropLife

Am.*, 329 F.3d at 883.[12]

However, in *General Electric Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002), our

Circuit noted that the two lines of inquiry overlap in their final steps: both focus on

whether the agency action binds private parties or the agency itself with the "force of

law." *Id.* at 382. The court held that "binding obligations upon applicants" that appeared

---

[12] An agency pronouncement can be binding even if it has not been published in the
Federal Register or Code of Federal Regulations. *See Appalachian Power Co. v. EPA*,
208 F.3d 1015, 1020-21 (D.C. Cir. 2000).

"on [the] face" of the agency documents were "sufficient" to render them a legislative rule requiring notice and comment. *Id.* at 385. A document may be binding even if not binding on its face: "[a]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding." *Id.* at 382 (citations omitted).

Our Circuit has elaborated in other cases. "If an agency acts as if a document . . . is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes 'binding.'" *Appalachian Power Co.*, 208 F.3d at 1021 (citation omitted). Notably, "the agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the 'force of law,' but the record indicates otherwise." *CropLife*, 329 F.3d at 883 (citations omitted).

While not expressly binding, the language of the OEM suggests that the agencies are expected to use the OEM. The body of the OEM uses commanding verbs: "This information *will* be used," FWSAR 2400 (emphasis added); "All . . . acres of suitable habitat . . . *will* be used," *id.* at 2402 (emphasis added); "The [biological assessment] *will* identify," *id.* (emphasis added); "the agency action *will* provide" *id.* (emphasis added). *See Appalachian Power Co.*, 208 F.3d at 1023 (language that "commands . . . requires . . .

orders . . . dictates" is indicative of an intent to bind); *see also McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320-21 (D.C. Cir. 1988) ("The use of the word 'will' suggests the rigor of a rule, not the pliancy of a policy") (citations omitted); *Chiang v. Kempthorne*, 503 F. Supp. 2d 343, 350 (D.D.C. 2007) ("the mandatory language of a document alone can be sufficient to render it binding.") (quoting *Gen. Elec. Co.*, 290 F.3d at 383). While the OEM encourages the agencies to use survey data where available, it asserts that "[i]nformation derived from the methodology described herein *should* be included in the Biological Assessment and *will* assist the FWS in evaluating the potential for incidental take of spotted owls to be included in a Biological Opinion, as appropriate." FWSAR 2399 (emphases added).

Defendants advance several arguments for why the OEM does not evince an intent to bind. First, defendants emphasize that the OEM does not *expressly* purport to bind the agency. *See* Defs.' Mot. at 35-36 (citing, *inter alia*, *Amoco Prod. Co. v. Watson*, 410 F.3d 722 (D.C. Cir. 2005), *aff'd on other grounds sub nom. BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006)).[13] To be sure, the OEM includes a standard sentence to indicate that it may be optional: "BLM and FS [staff] are encouraged to follow this methodology when

---

[13] In *Amoco Production Co.*, our Circuit quoted *Independent Petroleum Ass'n of America v. Babbitt* in holding that an agency letter "is not an agency rule at all, legislative *or* otherwise, because it does not purport to, nor is it capable of, binding the agency." *Amoco Prod. Co.*, 410 F.3d at 732 (quoting *Indep. Petroleum Ass'n of Am.*, 92 F.3d at 1257). In both cases, the Circuit relied heavily upon the fact that the letter's author lacked the authority to announce binding agency rules, as opposed to the fact that the language of the letter was not binding in nature. *See Amoco Prod. Co.*, 410 F.3d at 732; *Indep. Petroleum Ass'n of Am.*, 92 F.3d at 1256.

assessing effects." FWSAR 2399.  But, as discussed above, a document that does not purport to bind an agency—and even one that expressly purports to be non-binding—can be considered binding nonetheless if the agency applies the document in a way that indicates it is binding.

Next, defendants note that the OEM recognizes the use of non-NSOOM tools, including survey data and "predictive owl occupancy models," to predict owl population. *See* Defs.' Mot. at 36 (citing FWSAR 2438).  Defendants improperly conclude that, because the agencies recognize non-NSOOM tools as viable alternatives to the NSOOM, the agencies do not intend the OEM to be binding.  To the contrary: because the OEM *condones* the use of non-NSOOM tools to estimate owl populations in certain circumstances, the agency *adheres* to the OEM by using both the NSOOM and other tools to estimate owl population.  *Cf. McLouth Steel Prods. Corp.*, 838 F.2d at 1321 (legislative rule existed where agency reserved discretion to use multiple approaches to determine the impact of unregulated waste disposal).

Not only is the OEM's language suggestive of an intent to bind, but the agencies also have applied the OEM as if it were binding with respect to western Oregon timber sales.  Plaintiffs acknowledge that the OEM has not yet been treated as binding in Washington and California, two states with northern spotted owl populations.  Pls.' Reply at 26.[14]  However, the OEM expressly identified Oregon as the preliminary focus of its

---

[14]   Indeed, of the eight FWS offices within the range of the northern spotted owl, five have never used the OEM.  *See* Defs.' Mot. at 39 (identifying three California offices, one Washington office, and one Oregon office that have never used the OEM).

analysis, FWSAR 2419, and accordingly, the agencies have used the OEM consistently in

western Oregon timber sales consultations.  In these consultations since 2008, FWS has

used or cited the OEM in 42 of the 43 biological opinions, 24 of the 29 letters of

concurrence, and 45 of the 47 biological assessments.  *See* Pls.' Mem. at 34-35; Pls.'

Reply at 26-29.  The exceptions were typically less significant actions in which little or no

owl habitat was affected or other data was available to estimate take.  *See, e.g.*, FWSAR

10410 (relied upon surveys and concluded no effect), 12677 (minor consultation with no

take expected), 12723, 13089, 13136, 13171; B/FAR 24155 (owl habitat maintained),

31253 (surveys available).  In many of the biological opinions for western Oregon timber

sales consultations, FWS ordered BLM or USFS to comply with the OEM during logging

projects as a condition of the opinion.  *See, e.g.*, FWSAR 10577 ("Monitoring for spotted

owls will comply with the [OEM].").  Such frequent use of the OEM across multiple

years of western Oregon timber projects supports this Court's conclusion that the OEM is,

in effect, a binding legislative rule.  Universal application is not necessary to render a rule

binding.  *See Appalachian Power Co.*, 208 F.3d at 1023 (EPA guidance considered

binding even though two states may have failed to follow it); *Chiang*, 503 F. Supp. 2d at

350 (single example of binding use sufficient).

### B.     Final Agency Action

As with Claim One, defendants again contest that Claims Two and Three must fail

because the OEM is not a final agency action subject to judicial review.  Defs.' Mot. at

25-26.  As discussed above, a "final" agency action is "the consummation of the

agency's decisionmaking process" and "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78 (citations and internal quotation marks omitted).  Our Circuit has suggested that, once an agency action qualifies as a "binding" rule requiring notice and comment, it must also necessarily qualify as a "final" agency action.  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006) ("In order to sustain their position, appellants must show that the 1998 policy guidelines either (1) reflect 'final agency action,' 5 U.S.C. § 704, or (2) constitute a *de facto* rule or binding norm that could not properly be promulgated absent the notice-and-comment rulemaking required by § 553 of the APA.  These two inquiries are alternative ways of viewing the question before the court.  Although, if appellants could demonstrate the latter proposition they would implicitly prove the former, because the agency's adoption of a binding norm obviously would reflect final agency action.").  *But see Appalachian Power Co.*, 208 F.3d at 1022 ("an agency's action is not necessarily final merely because it is binding").

Regardless of whether the "binding rule" inquiry is dispositive of finality, it is clear that OEM constitutes "final" agency action.  The OEM represents the consummation of an interagency team's process to develop a methodology for measuring spotted owl incidental take in response to the *ONRC* case.  FWSAR 2399; *see also Nat'l Ass'n of Homebuilders v. Norton*, 298 F. Supp. 2d 68, 77 (D.D.C. 2003) ("all that the consummation condition requires is that a decision-making process was brought to completion").  And, as demonstrated above, the OEM has clear legal consequences for

federal timber contractors working in areas with northern spotted owl incidental take statements. While the agencies "anticipate updating the [OEM] as new information becomes available," Defs.' Mot. at 43 (citing FWSAR 2433), the possibility of ongoing updates does not negate the OEM's finality. *See U.S. Air Tour Assoc. v. FAA*, 298 F.3d 997, 1013 (D.C. Cir. 2002) ("if the possibility . . . of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule . . . would ever be final as a matter of law.") (citations and internal quotation marks omitted); *Gen. Elec. Co.*, 290 F.3d at 380 ("'The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment.'") (quoting *Appalachian Power Co.*, 208 F.3d at 1022).

Defendants rely heavily upon *National Association of Homebuilders*, a case from this Court holding that a survey protocol for endangered butterflies did not constitute "final" agency action. *See* 298 F. Supp. 2d at 79. While FWS issued the protocol, the protocol was designed for use by landowners—not by FWS—as a way for landowners to *voluntarily* assess whether their activities threatened to "take" the endangered butterflies. *Id.* at 72-73. Due to its non-binding, voluntary nature, the Court found that the protocol did not "determine rights or obligations of landowners." *Id.* at 79. Unlike this protocol designed for *public* use, the OEM was designed for *agency* use. And the OEM was not simply a voluntary public-use protocol but rather an agency direction that possessed the "force of law." As such, it qualifies as "final" agency action under the *Bennett* test.

## C.    Remedy

Because the OEM constitutes a legislative rule and should have been submitted to the APA's rulemaking procedures, the Court sets aside the OEM and prohibits its use by defendants unless and until the methodology is submitted to rulemaking procedures.  *See* 5 U.S.C. § 706(2) (Court may hold unlawful and set aside agency action not in accordance with law or without observance of procedure required by law); *see also Appalachian Power Co.*, 208 F.3d at 1028 (setting aside agency guidance document not properly submitted to rulemaking procedures).

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART plaintiff's motion for summary judgment, GRANTS IN PART AND DENIES IN PART defendants' cross-motion for summary judgment, and DENIES defendant-intervenors' cross-motion for summary judgment.  An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge